## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JONETTA BOSTIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-0541-CVE-JFJ** |
| | ) | |
| **CITY OF JENKS, CHRIS SHROUT, in his** | ) | |
| **individual capacity as City Manager,** | ) | |
| **REBECCA STEWART, in her individual** | ) | |
| **capacity as Assistant City Manager,** | ) | |
| **LISA BREWER, in her individual** | ) | |
| **capacity as Human Resources Administrator,** | ) | |
| **TERESA NOWLIN, in her individual** | ) | |
| **capacity as City Attorney, and** | ) | |
| **CAMERON ARTHUR, in his** | ) | |
| **individual capacity as Chief of Police,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Motion for Partial Dismissal of Plaintiff's

Amended Complaint on Behalf of Defendants Chris Shrout, Rebecca Stewart, Lisa Brewer, and

Teresa Nowlin and Brief in Support (Dkt. # 19); Motion for Partial Dismissal of Plaintiff's Amended

Complaint on Behalf of Defendant City of Jenks and Brief in Support (Dkt. # 20); and the Motion

to Dismiss Plaintiff's Amended Complaint on Behalf of Defendant Cameron Arthur and Brief in

Support (Dkt. # 21). Plaintiff has filed an amended complaint (Dkt. # 15) alleging 18 claims arising

from termination of her employment.[1] Defendants seek the dismissal of many of plaintiff's claims

for failure to state a claim upon which relief can be granted.

---

[1]      Although the amended complaint lists claims up to "XVII," plaintiff includes two claims
numbered "XVII," and she has alleged 18 claims for relief. The Court will refer to plaintiff's
second "Count XVII", which is a 42 U.S.C. §1985 claim, as Count XVIII.

**I.**

Plaintiff Jonetta Bostic alleges that she worked for the City of Jenks (the City) from August 18, 2014 to June 21, 2018 as an assistant finance director/deputy city clerk. Dkt. # 15, at 5.  Bostic's immediate supervisor was Josh McCorkle, and she claims that McCorkle regularly yelled at Bostic and berated her.  Id. at 7.  She also alleges that McCorkle stared at her breasts every time she entered his office, and she began to limit her interaction with McCorkle and avoid going into his office.  Id. Bostic is a certified public accountant (CPA) and she claims that McCorkle disregarded her advice on financial matters, and he sought advice from a male CPA rather than accept her guidance.  Id. Bostic alleges that she was excluded from meetings and McCorkle refused to give her information that she needed to do her job.  Id.  Bostic alleges that older employees were being forced out of their employment and, in June 2017, she overheard McCorkle say that he did not want to hire a female applicant for a job because she was "kind of old."  Id.

Bostic claims that she was mistreated by a younger, male co-worker who occupied a subordinate position, and she brought the matter to McCorkle's attention.  Id. at 7-8.  McCorkle called Bostic and the subordinate together for a meeting, and Bostic claims that McCorkle inappropriately treated them as equals and undermined her authority.  Id. at 8.  Bostic alleges that the city planner, Robert Bell, repeatedly made sexual comments in plaintiff's presence, and she claims that McCorkle failed to take any action to prevent Bell's conduct.  Id.  However, she does not allege that she reported Bell's conduct to McCorkle or asked him to intervene.  Bostic alleges that she was treated differently than her male co-workers in terms of pay.  She claims that she was repeatedly denied merit pay increases that were awarded to younger and male co-workers, even though she received positive performance evaluations.  Id.  She also claims that she was paid a lower

salary than similarly-situated male co-workers, and she identifies McCorkle as a similarly-situated male employee.  Id.

Bostic alleges that the stress caused by the discriminatory conduct aggravated some of her medical conditions, including, but not limited to, cervical osteoarthritis, degenerative joint disease, fibromyalgia, tourette syndrome, sjogren's syndrome, hashimoto/hyper thyroid disorder, major depressive disorder, extreme obsessive compulsive disorder, attention deficit disorder, anxiety, body dysmorphic disorder, and inflammatory bowel disorder.  Id. at 9.  Bostic also claims that she is a qualified person with a disability under the American with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (ADAAA).  Id. at 9.  She alleges that she was required to take intermittent medical leave in early 2016, but the City failed to inform her that she was eligible to take leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA).  Id. at 10.  Bostic learned from a physician that she could be eligible for leave under the FMLA, and she submitted the appropriate paperwork to the City.  Id.  Bostic claims that the City required her to exhaust her vacation and sick time before taking leave under the FMLA.  Id.  McCorkle allegedly mocked Bostic for taking so much medical leave and made inappropriate jokes about plaintiff's low body weight.  Id. at 11.

Bostic also alleges that McCorkle mocked her religious beliefs by making fun of her "ethics" and telling her almost every other week that Bostic "didn't even know if there really was a Jesus." Id. at 11. McCorkle also allegedly "used Jesus Christ's name in vain" and forbade employees from putting up religious decorations near the holidays.  Id.  In June 2017, Bostic complained to the human resources administrator, Lisa Brewer, about McCorkle's behavior and claimed that she was subject to a hostile work environment.  Id.  City manager Chris Shrout prepared a report concerning

3

Bostic's allegations and the report allegedly identified evidence corroborating Bostic's allegations, but the report concluded that McCorkle's conduct was not discrimination based on any protected status.  Id. at 12.  While he was preparing his report, Shrout uncovered actions of Bostic that violated City policy, and Bostic was disciplined on July 27, 2017.  Id.  Bostic claims that the discipline was retaliation for reporting McCorkle's discriminatory behavior and for reporting mismanagement of City funds to the Oklahoma Department of Transportation (DOT).  Id. at 12-13.  Bostic also made complaints to Shrout, Brewer, Stewart, and Nowlin about the mismanagement of funds by the Jenks Aquarium Authority and the improper designation of employees as independent contractors for payroll purposes.  Id. at 13.  Bostic also alleges that she was improperly designated as an exempt employee for the purpose of the Fair Labor Standards Act, 29 U.S.C. § 207 (FLSA), and she claims that she was not paid overtime for hours worked in excess of 40 hours per week.  Id.

In October 2017, Bostic submitted a request to work from home one day a week based upon a recommendation by her physician, but Stewart denied Bostic's request.  Id. at 14.  Instead of allowing her to work from home, the City offered to reduce her hours to 40 hours per week, but Bostic claims that these were the standard office hours for City employees.  Id.  On November 3, 2017, Bostic was written up for using FMLA leave, and Bostic alleges that the stated reason for the write-up was baseless.  Id.  In January 2018, the City started soliciting applications for Bostic's job, even though she was still employed by the City.  Id.  Bostic complained to Shrout and Nowlin that Stewart acted unreasonably by denying her request for an accommodation, and Bostic alleged that other employees were also denied accommodations.  Id.  Bostic sent an e-mail to the Equal Employment Opportunity Commission (EEOC) complaining of alleged workplace discrimination, and she filed a formal charge of discrimination on April 13, 2018.  Id. at 2015.  In March 2018, the

4

City was notified that the State Auditor and Inspector's Office wanted to review some of the accounting issues raised by Bostic, and Bostic alleges that the City significantly cut her pay without offering her any explanation. Id. at 15. In April 2018, Bostic was disciplined for yelling at other employees and engaging in disruptive behavior, but Bostic denies that she engaged in the actions cited in the write-up. Id. at 16.

On June 21, 2018, Bostic went to work and she was called into a meeting with Stewart, McCorkle, Brewer, and the chief of police, Cameron Arthur. Id. McCorkle told Bostic that her employment was not "working out" and that she was being fired. Id. Bostic claims that she asked for further explanation, but she was simply told by Arthur that she needed to leave. Id. On September 13, 2018, Bostic drove to city hall to make a COBRA payment, and Arthur approached Bostic and accused her of being under the influence. Id. at 17. Bostic denied that she was under the influence of drugs or alcohol, but Arthur demanded that she hand over her car keys and get out of her car. Id. at 17-18. Arthur and a Jenks police officer allegedly mocked Bostic because of her disabilities, and Arthur told Bostic that she could not drive in Jenks unless she "drops it all." Id. at 18-19. Bostic understood Arthur to be referring to her EEOC charge and other complaints of discriminatory conduct against City officials. Id. at 19. Several weeks later, Bostic learned that her driver's license had been suspended after the City reported to the Oklahoma Department of Public Safety that Bostic had an impairment that prevented her from driving safely. Id.

On October 10, 2019, Bostic filed a complaint (Dkt. # 2) alleging 18 claims against the City, Shrout, Stewart, Brewer, Nowlin, and Arthur. Bostic subsequently filed an amended complaint alleging claims under Title VII (Counts I and III), the Equal Pay Act, 29 U.S.C. § 206(d) (Count II), the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (ADEA) (Counts IV and V),

the ADA (Count VI), the FMLA (Count VII), the Fair Labor Standards Act, 29 U.S.C. § 216(b) (FLSA) (Counts VIII and IX), 42 U.S.C. §§ 1983 and 1985 claims (Counts X, XI, XVII, and XVIII), and state law claims (Counts XII, XIII, XIV, XV, and XVI).

## II.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to a claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

6

## III.

Each of the defendants has filed a motion to dismiss, and they asks the Court to dismiss many of plaintiff's claims.  The Court will initially consider the motion to dismiss filed by the City (Dkt. # 20).  Defendants Shrout, Stewart, Brewer, and Nowlin (the individual defendants) raise many of the same arguments in their motion to dismiss, and the Court will consider any overlapping arguments in ruling on the City's motion to dismiss.  After ruling on the City's motion to dismiss, the Court will next consider the individual defendant's request to dismiss plaintiff's state law claims of intentional infliction of emotional distress (Count XVI) and tortious interference (Counts XIII and XIV), and her § 1985 claim (Count XVIII).  Dkt. # 19.  Finally, the Court will consider Arthur's motion to dismiss the two claims asserted against him for intentional infliction of emotional distress (Count XVI) and a violation of plaintiff's Fourth Amendment rights (Count XVII).  Dkt. # 21.

## A.

### Gender Discrimination (Count I)

Plaintiff asserts a Title VII claim (Count I) of gender discrimination under multiple theories.  Plaintiff claims that she was paid less than similarly-situated male employees and that her employment was terminated because of her gender.  Dkt. # 15, at 20.  She also alleges a gender discrimination claim under theories of sexual harassment and hostile work environment, and she claims that her employment was terminated in retaliation for engaging in protected activity.  Id.  The City moves to dismiss Count I as to all theories except for retaliation and, in this section of the Opinion and Order, the Court will consider the City's arguments as to sexual harassment and hostile work environment.  The Court will consider the City's arguments concerning plaintiff's unequal pay theory in ruling on her EPA claim.

7

Title VII prohibits an employer from discriminating against an employee on the basis of sex "with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is one form of workplace discrimination that is prohibited by Title VII. Kramer v. Wasatch Sheriff's Office, 743 F.3d 726, 737 (10th Cir. 2014). Workplace sexual harassment may take either of two forms: (1) "hostile work environment" harassment, which consists of offensive gender-based conduct that is severe or pervasive; or (2) "quid pro quo" harassment, which "occurs when submission to sexual conduct is made a condition of concrete employment benefits." Hicks v. Gates Rubber Co., 883 F.2d 1406, 1413 (10th Cir. 1987). Plaintiff is proceeding under a hostile work environment theory and she must adequately allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Fassbender v. Correct Care Solutions, LLC, 890 F.3d 875 (10th Cir. 2018) (quoting Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012)). "Isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775 (1998)).

The Court has reviewed the amended complaint and finds few allegations supporting plaintiff's sexual harassment claim. She alleges that McCorkle stared at her breasts nearly every time he entered plaintiff's office, and she began limiting her interactions with McCorkle and wearing oversized clothing. Dkt. # 15, at 7. Plaintiff alleges that the City planner, Robert Bell, made sexual comments in plaintiff's presence and McCorkle failed to take any remedial action, and she claims that Bell's conduct occurred on a weekly basis between March 2014 to March 2016. Id. at 8. However, plaintiff does not allege that she complained about Bell's conduct or that McCorkle was

8

actually aware that she found Bell's conduct offensive.  Id.  Plaintiff also makes no allegations that McCorkle or Bell's behavior interfered with ability to perform her job or otherwise altered the terms and conditions of her employment.  At most, plaintiff has alleged that there were isolated incidents of behavior that she found to be offensive, and she makes only a general allegation that these actions altered the terms and conditions of her employment.  Id. at 21.  Plaintiff has made no allegations that she was subject to physically threatening behavior and she did not feel sufficiently offended by McCorkle or Bell's conduct to make a complaint to her employer when the conduct allegedly occurred.  The Court also notes that plaintiff has made no attempt to allege that there was any temporal connection between McCorkle and Bell's alleged conduct and any adverse employment action.  The Court finds that plaintiff has failed to state a claim of sexual harassment under Title VII, and this claim should be dismissed.

Plaintiff also appears to be alleging a gender discrimination claim under a hostile work environment theory, separate from any claim of sexual harassment.  To state a prima facie claim of gender discrimination under a hostile work environment, a plaintiff must allege: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on his membership in a protected group; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of plaintiff's employment and created an abusive working environment.  Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007).  The Tenth Circuit has established that the severe and pervasive nature of the alleged harassment must be established under objective and subjective standards.  Harrison v. Eddy Potash, Inc. 248 F.3d 1014, 1023 (10th Cir. 2001).  Concerning the subjective aspect of a hostile work environment, the victim must show that she "subjectively perceive[d] th[at] environment to be abusive."  Id. (second

alteration in original).  The objective component of a hostile work environment claim requires a

plaintiff to present evidence that a "reasonable person" would find the same harassment so severe

and pervasive that the workplace is objectively hostile or abusive.  <u>Morris</u>, 666 F.3d at 664.  Plaintiff

has failed to state a claim under a hostile work environment theory for the same reasons that she has

not adequately alleged a claim of sexual harassment.  Plaintiff is a member of a protected group and

alleges that she was subject to unwelcome harassment, but she has not alleged that the harassment

was sufficiently severe or pervasive to alter the terms and conditions of her employment under an

objective standard.  Count I of the amended complaint is dismissed as to theories of sexual

harassment and hostile work environment.

**Unequal Pay (Counts I and II)**

The City argues that plaintiff has failed to state claims under the EPA (Count II) and Title

VII (Count I) concerning unequal pay, because plaintiff has not identified a similarly-situated male

employee who was allegedly paid more than her.  The City asks the Court to consider written job

descriptions in making a comparison between plaintiff and any allegedly similarly-situated male

employee, because plaintiff references the job descriptions in her amended complaint.  Dkt. # 20,

at 14 n.7.  Plaintiff responds that she has alleged sufficient facts to state claims that a similarly-

situated male co-worker, McCorkle, was paid more than she was for performing substantially the

same work, and she asks the Court not to consider the job descriptions.  Dkt. # 23, at 7-10.

The EPA prohibits an employer from discriminating "between employees on the basis of sex

by paying wages to employees in such establishment at a rate less than the rate at which he pays

wages to employees of the opposite sex in such establishment for equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are performed under

similar working conditions . . . ." 29 U.S.C. § 206(d)(1).  Under the EPA, the plaintiff has the burden to demonstrate that "(1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." Riser v. QEP Energy, 776 F.3d 1191, 1196 (10th Cir. 2015) (quoting Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1364 (10th Cir. 1997)).  If the plaintiff comes forward with evidence to support each element of a prima facie case under the EPA, the burden shifts to the employer to "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." Id. (emphasis in original).  The employer's burden is one of ultimate persuasion, and "in order to prevail at the summary judgment stage the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1311 (10th Cir. 2006).  At the pleading stage, it is not necessary for a plaintiff to frame her allegations in terms of a prima facie case of discrimination, but the Court may refer to the burden shifting analysis as a means to consider whether the plaintiff has alleged a plausible claim of discrimination. See Bekkem v. Wilkie, 915 F. 3d 1258, 1275 (10th Cir. 2019).[2]

---

[2]     Plaintiff has alleged several claims that would be subject to a burden shifting analysis on a motion for summary judgment, and the Court cites Bekkem for the general proposition that it is not necessary for a plaintiff to frame her claims in terms of this burden shifting analysis at the pleading stage.  The Court notes the burden shifting analysis as a means to explain the applicable law, because there are frequently no Tenth Circuit cases reviewing a district court's ruling on a motion to dismiss as to certain claims.  Even if the Court mentions the burden shifting analysis, plaintiff's burden at the pleading stage is merely to allege sufficient facts supporting an inference of discriminatory conduct for the theory or claim at issue.

Under Title VII, the plaintiff must prove that her employer intentionally discriminated against her on the basis of her gender, and the ultimate burden of persuasion at all times remains with the plaintiff. Riser, 77 F.3d at 1199. At the summary judgment stage, Title VII claims are subject to a burden shifting analysis and the Court notes that the burden shifting analysis is different under the EPA and Title VII. Stice v. City of Tulsa, 2018 WL 2218894 (N.D. Okla. July 5, 2018). However, for the purpose of this Opinion and Order, the key issue for plaintiff's Title VII claim concerning unequal pay is whether plaintiff has adequately alleged that the City intentionally discriminated against her by paying her less than a similarly-situated male co-worker.

The Court finds that the City's arguments on these claims should be considered in ruling on a motion for summary judgment, because plaintiff has alleged that she was paid less than a similarly-situated male co-worker and the City's motion to dismiss these claims is based on evidence outside of the pleadings. The City argues that McCorkle is not similarly-situated to plaintiff in terms of his job duties, and the City asks the Court to consider evidence outside of the pleadings to make this determination. Dkt. # 20, at 14 n.7. Plaintiff alleges that she was paid less than similarly-situated male employees, including McCorkle, and she does mention the City's written job descriptions in her amended complaint. Dkt. # 15, at 22. However, the Tenth Circuit has made clear that the comparison between the plaintiff and allegedly similarly-situated employees requires a district court to consider the "actual content of the job–not mere job descriptions or titles." Riser, 776 F.3d at 1196. For the purpose of ruling on a motion to dismiss, plaintiff has adequately alleged that she was similarly-situated to McCorkle in terms of her job duties and that she was paid less than McCorkle for performing similar work. At the summary judgment stage, plaintiff will have to produce evidence establishing a relatively high degree of similarity between the work performed by herself

and McCorkle, but the Court finds that plaintiff has adequately stated a claim under the EPA and Title VII concerning unequal pay.

## Religious Discrimination (Count III)

The City argues that plaintiff's Title VII claim of religious discrimination (Count III) should be dismissed, because she has failed to make any specific allegations tying McCorkle's alleged mockery of her religious beliefs to an adverse employment action.  Dkt. # 20, at 21.  Claims of religious discrimination under Title VII are subject to the same type of burden-shifting analysis of other claims of discrimination, such as plaintiff's gender discrimination claim.  Milam v. Pafford EMS, 729 F. App'x 632 (10th Cir. Mar. 30, 2018).[3]  Plaintiff has also asserted a claim of religious discrimination based on a hostile work environment theory, which is subject to the same requirement previously considered in the context of plaintiff's gender discrimination claim.

The City does not contest that plaintiff is the member of a protected group in terms of her religion or that plaintiff was satisfactorily performing her job, but the City argues that plaintiff has failed to allege any facts suggesting a causal connection between her religious beliefs and her termination.  Plaintiff alleges that McCorkle made fun of her "ethics" and he told her approximately every other week that she "didn't even know if there was really a Jesus."  Id. at 11.  She further alleges that McCorkle "used Jesus Christ's name in vain," even though plaintiff said that she was offended by McCorkle's conduct.  Id.  However, plaintiff does not allege when these events occurred and there is no basis for the Court to infer that McCorkle's actions occurred near the time of her termination.  There is also nothing about McCorkle's alleged comments that suggest he was seeking

---

[3]     Unpublished decisions are not precedential and may be used for their persuasive value only. FED. R. APP. 32.1; 10th CIR. R. 32.1.

to terminate plaintiff's employment because of her religious beliefs, even if he personally held different beliefs.  Although plaintiff may have been offended by McCorkle's conduct, isolated remarks about plaintiff's religious beliefs do not support an inference that her employment was terminated because of her religion.  Plaintiff's allegations also do not suggest that McCorkle's comments about her religious beliefs were so frequent or pervasive that this could have altered the terms or conditions of plaintiff's employment.  The Court finds that plaintiff's Title VII claim based on religious discrimination (Count III) should be dismissed.

**Age Discrimination (Count IV)**

The City argues that plaintiff has failed to state a claim for age discrimination (Count IV) or a claim that she was subject to a hostile work environment based on age-related discrimination.[4] Dkt. # 20, at 22-25.  Plaintiff responds that her allegations are sufficient to support an inference that age discrimination played a role in her termination, and she has also alleged sufficient facts to state a claim of age discrimination under a hostile work environment theory.

To establish a prima facie case of age discrimination, a plaintiff must show: (1) that she is within the protected age group; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) she was treated less favorably than others not in the protected class. Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1279 (10th Cir. 2010).  The mixed-motive analysis established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), does not apply to claims under the ADEA, and a plaintiff asserting an age discrimination claim under the ADEA retains the "burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."

---

[4]     Plaintiff has alleged a separate retaliation claim under the ADEA (count V), but the City has not moved to dismiss that claim.

Gross v. FBL Financial Servs., Inc., 557 U.S. 167, 177 (2009).  The Tenth Circuit has found that Gross was consistent with existing Tenth Circuit precedent, and a plaintiff asserting an ADEA claim has the burden to prove that "age was the factor that made a difference," even if age was not the sole motivating factor for an employer's decision.  Jones, 617 F.3d at 1277.

Plaintiff alleges that McCorkle treated her differently than younger co-workers and she claims that older employees were forced out of their jobs. Dkt. # 15, at 7.  In June 2017, McCorkle allegedly stated that he did not want to hire a female applicant for a position, because she was "kind of old."  Id.  Plaintiff also claims that McCorkle allowed younger workers to mistreat her and that he undermined her authority.  The primary incident she cites occurred in September 2016, and plaintiff alleges that Seth Duck, a younger and subordinate co-worker, said "fuck you" when plaintiff asked him to do something.  Id. at 7-8.  McCorkle allegedly called Duck and plaintiff together for a meeting to discuss the incident and treated them as if they held equal positions.

The Court finds that plaintiff's allegations are not sufficient to support an inference that age was the "factor that made a difference" in the decision to terminate her employment.  The Court initially notes that the incident with Duck occurred almost two years before plaintiff's employment was terminated in June 2018, and no causal connection can be inferred between this incident and plaintiff's termination.  McCorkle's statement about a female job applicant occurred approximately one year before plaintiff's termination, and this incident is also somewhat remote in time for the purpose of supporting an inference that age had anything to do with an adverse employment action.  The Court find that plaintiff has not alleged a plausible claim of age discrimination, because she has not alleged sufficient facts to suggest that age was a significant factor in the decision to terminate her employment.  The Court also finds that plaintiff's allegations are wholly insufficient to support

a finding that age discrimination or harassment was so severe or pervasive that it altered the terms

or conditions of plaintiff's employment.  At most, plaintiff has alleged that there were two isolated

incidents or stray remarks, and plaintiff has not alleged sufficient facts to support a claim of age

discrimination under a hostile work environment theory.  Count IV of the amended complaint should

be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**FMLA Inteference (Count VII)**

The City argues that plaintiff has failed to state a claim for interference with her rights under

the FMLA, because plaintiff does not allege that she was ever denied FMLA leave and it was not a

violation of the FMLA to require plaintiff to exhaust her accrued paid leave before taking FMLA

leave.  Dkt. # 19, at 24-26.  Plaintiff asserts that the City waived these arguments by failing to raise

them in their motion to dismiss plaintiff's original complaint.[5]  Dkt. # 23, at 27.  Plaintiff also argues

that the City illegally required her to exhaust her paid leave before taking FMLA leave, and the City

engaged in acts intended to chill plaintiff from using her FMLA leave.  Id. at 28.

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or

the attempt to exercise, any right provided."  29 U.S.C. § 2615(a)(1).  To establish an FMLA

interference claim, a plaintiff must show "(1) that [she] was entitled to FMLA leave, (2) that some

adverse action by the employer interfered with [her] right to take FMLA leave, and (3) that the

employer's action was related to the exercise or attempted exercise of [her] FMLA rights."  Jones

v. Denver Pub. Sch., 427 F. 3d 1315, 1319 (10th Cir. 2005).  An employee may allege an FMLA

---

[5]    This argument is based on an unpublished decision from a federal district court.  See Jo Ann
Howard & Assoc., P.C. v. Cassity, 2013 WL 797972 (E.D. Mo. Mar. 5, 2013).  However,
plaintiff did not file a response to defendants' motions to dismiss the original complaint and
the Court never ruled on the motions, and the Court declines to find that any arguments not
raised in the original motions to dismiss are waived.

interference claim based on interference with the right to take the full amount of FMLA leave, the denial of reinstatement after taking FMLA leave, or the denial of initial permission to take FMLA leave.  Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007).  Under an interference theory, an employer's intent in denying or interfering with an employee's FMLA rights is not relevant.  See Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004).  Nonetheless, the FMLA is not a strict liability statute, and nothing in the FMLA entitles an employee to greater protection from termination not related to her FMLA leave.  Metzler v. Federal Home Loan Bank of Topeka, 464 F. 3d 1164, 1180 (10th Cir. 2006).

The Court will initially consider the parties' arguments concerning the City's policy that an employee exhaust her paid leave before seeking to take leave under the FMLA.  Plaintiff argues that the City violated the FMLA by requiring her to use her accrued sick leave and paid time off before utilizing her 12 weeks of leave under the FMLA.  However, the Court can find no authority supporting plaintiff's argument and employers are typically permitted to require that an employee exhaust other sources of time off before making a formal request to take FMLA leave.  Crites v. City of Haysville, Kansas, 2018 WL 2236855 *10 (D. Kan. May 16, 2018); Poindexter v. City of Sallisaw, 2011 WL 5330746 (E.D. Okla. Nov. 7, 2011).  Plaintiff complains that the City did not inform her of her right to take FMLA leave.  Dkt. # 15, at 10.  However, the Supreme Court has explained that individualized notice is not required under the FMLA, and plaintiff makes no allegations that the City failed to publicly post notice as required by federal regulations.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 92 (2002).  Plaintiff claims that the City instructed her that she could not use FMLA leave until she used up her sick time and paid time off, but she clearly alleges that she was later permitted to take FMLA leave when she exhausted her other sources of

paid time off provided by the City.  Dkt. # 10, at 10, 14, 16.  Plaintiff argues that she was "bullied" about taking FMLA leave, but she has made no allegations that she was ever denied time off for a permitted reason under the FMLA or that she was discouraged from requesting FMLA leave after she exhausted her paid time off.[6]  In fact, the City's policy provided her 12 weeks of FMLA leave in addition to her sick leave and paid time off, even though the City could potentially have made her paid time off and FMLA run concurrently, and plaintiff would have had less time off if the City strictly complied with the FMLA.  Plaintiff was not prejudiced by the City's FMLA leave policy and she cannot state a claim for interference with her rights under the FMLA.  Ragsdale, 535 U.S. at 89.

## FLSA Misclassification (Count VIII)

The City argues that plaintiff was properly classified as exempt employee who was not eligible for overtime under the FLSA, because she was performing the duties of a "learned professional" who was properly paid on a salary basis.  Dkt. # 20, at 26.  Plaintiff responds that the City began making improper deductions from her paycheck in 2018, and she has adequately alleged that she was not being paid on a salary basis.  Dkt. # 23, at 29.

Under the FLSA, an employer must pay an employee overtime compensation for all hours worked in excess of 40 hours per week unless the employee is classified as exempt.  29 U.S.C. § 207(a)(1).  The employer bears the burden to establish that an employee qualifies as exempt.  Kenney v. Helix TCS, Inc., 939 F.3d 1106 (10th Cir. 2019); Lederman v. Frontier Fire Protection, Inc., 685

---

[6]     Plaintiff has alleged a separate claim for FMLA retaliation in Count VII, and her allegations of "bullying" and wrongful termination for taking FMLA leave are more properly considered in the context of her retaliation claim.  Defendants have not sought the dismissal of the FMLA retaliation claim in their motions to dismiss.

F.3d 1151, 1156 (10th Cir. 2012). The City argues that plaintiff was properly classified as exempt employee based on the "learned professional" exemption, which has three requirements:

(1) The employee must perform work requiring advanced knowledge;

(2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301. The Court finds that there are fact issues that prevent the Court from considering the City's arguments in the context of a motion to dismiss. Plaintiff may qualify as a "learned professional," but the Court cannot make this determination solely based on the allegations of the complaint. Plaintiff also argues that the City improperly deducted amounts from her paycheck and, therefore, plaintiff may have lost her exempt status due to the City's actions. See Ellis v. J.R.'s Country Store, Inc., 779 F.3d 1184, 1188 (10th Cir. 2015). The Court also cannot determine whether deductions made from plaintiff's paycheck were improper under 29 C.F.R. § 541.602. Defendant's motion to dismiss is denied as to plaintiff's FLSA claim (Count VIII) and, for the same reasons, the Court finds that plaintiff's state law claim concerning overtime pay (Count XV) should also not be dismissed at the pleading stage.

**Fourteenth Amendment (Count X)**

Defendants[7] argue that plaintiff has failed to state a claim for violation of her right to equal protection, because she has failed to identify the classification at issue and she fails to identify precisely what conduct by each defendant allegedly violated her constitutional rights. Dkt. # 19, at

---

[7]     Counts X and XI of the amended complaint are alleged against the City, Shrout, Stewart, Nowlin, and Brewer.

9.  The City also argues that plaintiff has failed to identify an official policy or custom that violated her constitutional rights.  Dkt. # 20, at 30.

Under § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983.  The elements necessary to establish a § 1983 violation "will vary based on the constitutional provision at issue."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Regardless of the constitutional provision at issue, however, "[p]ersonal participation is an essential allegation in a § 1983 claim." Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  In the context of § 1983 cases against multiple individual government actors, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." Robbins v. Oklahoma, 519 F.3d 1242, 1249 (10th Cir. 2008) (emphasis in original).  "[T]he complaint must therefore 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face' as to the specific constitutionally impermissible actions allegedly committed by each named defendant to survive a motion to dismiss as to each defendant." Brewer v. Gilroy, 625 Fed. App'x 827, 833 (10th Cir. 2015) (quoting Ashcroft, 556 U.S. at 678) (internal quotations omitted).  When the defendant is a municipal entity, the "under color of state law" element of a § 1983 claim requires that the constitutional deprivation occurred pursuant to official policy or custom. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

The Court has reviewed plaintiff's amended complaint and finds that she has not stated a claim under § 1983 for violation of her right to equal protection.  The amended complaint simply

contains a formulaic recitation that the individual defendants were acting under color of state law, and plaintiff fails to specify what classification is at issue or what specific actions by each defendant allegedly violated her constitutional rights.  In response to the motions to dismiss, plaintiff lists sporadic allegations from her complaint concerning her wide-ranging allegations of discrimination, but most of the allegations she identifies relate to the conduct of McCorkle.  Plaintiff did not name McCorkle as a defendant, and the individual defendants cannot be held liable under § 1983 for another person's actions.  As to the City, plaintiff argues the Court should infer that the City had a policy to allow discriminatory conduct, because it took no steps to reprimand McCorkle or prevent his alleged discriminatory behavior.  Dkt. # 23, at 31.  However, the amended complaint contains no allegations that the City was acting pursuant to an official policy or custom to tolerate discriminatory behavior, and plaintiff has not stated a § 1983 claim against the City.  Plaintiff has not stated a § 1983 claim against the individual defendants or the City, and Count X of the amended complaint is dismissed.

**First Amendment (Count XI)**

Defendants argues that plaintiff has failed to specify what actions by each individual defendant allegedly violated her First Amendment right to free speech and, even if she had, plaintiff has failed to state a claim under the Garcetti/Pickering[8] test.  Dkt. # 19, at 10.  Plaintiff alleges that the City, Shrout, Stewart, Brewer, and Nowlin retaliated against her for exercising her First

---

[8]     Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Board of Education, 391 U.S. 563 (1968).

Amendment right to free speech, and she claims that she was acting as a private citizen when submitted reports of mismanagement of City funds to a state auditor.[9]  Dkt. # 23, at 32-34.

Retaliation claims arising under the First Amendment are governed by the Garcetti/Pickering test, which contains five elements:

1.     The protected speech was not made pursuant to an employee's official duties.

2.     The protected speech addressed a matter of public concern.

3.     The government's interests as an employer did not outweigh the employee's free-speech interests.

4.     The protected speech was a motivating factor in the adverse employment action.

5.     The defendant would not have made the same employment decision in the absence of the protected speech.

Lincoln v. Maketa, 880 F.3d 533, 538 (10th Cir. 2018).  Defendants argue that plaintiff's claim fails on the first element of the Garcetti/Pickering test, because she was acting within the scope of her employment when she made reports concerning the alleged mismanagement of City funds.  Dkt. # 19, at 11-13.  The Supreme Court has clearly held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.  There is no bright-line rule that governs when speech is made as part of an employee's official duties, and this inquiry must be made on a case-by-case basis.  Lincoln, 880 F.3d at 538.  The Tenth Circuit takes a broad view of the concept of speech pursuant to an

---

[9]     The Court notes that plaintiff alleges that she was acting as a private citizen when she engaged in the speech at issue, but this is a legal conclusion that the Court is not required to accept as true in ruling on a motion to dismiss.  Butler v. Board of County Commissioners for San Miguel County, 920 F.3d 651, 655 (10th Cir. 2019).

employee's official duties, and speech can be considered part of an employee's duties if it "reasonably contributes to or facilitates the employee's performance of the official duty . . . ." Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir. 2008).  However, speech is not automatically subject to an employer's restrictions because it occurs at work, and a court must take a practical view of the facts and circumstances surrounding the speech and the employment relationship.  Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713-14 (10th Cir. 2010).

Plaintiff alleges that she was hired primarily because "McCorkle was not strong in finance and the City needed a [CPA]."  Dkt. # 15, at 5.  She does not provide a detailed description of her employment duties as assistant finance director for the City, but she explains that her background in government finance was a key factor in the City's decision to hire her.  Id. at 5-6.  She claims that she was engaging in speech as a private citizen when she externally reported "to the State Auditor her concerns that the City was misusing and failing to properly account for public funds," and she argues that defendants retaliated against by reducing her pay and later terminating her employment for engaging in this conduct.  Id. at 34.  The alleged misconduct she was reporting to an external agency was discovered because of her employment, and it is reasonable to infer that she discovered the misconduct due to her responsibilities as an accountant.  The Tenth Circuit has provided some guidance to distinguish between "official" and "unofficial" acts.  In Casey v. West Las Vegas Independent School Dist., 473 F.3d 1323 (10th Cir. 2007), the plaintiff was the chief executive officer of a Head Start program, and she reported to the school board that families were misrepresenting their income in order to participate in Head Start.  Id. at 1326.  The school board ignored her complaints and she directed her complaints to a federal agency overseeing Head Start. Id.  The plaintiff also believed that the school board was violating the state open meetings act and

she relayed her concerns to the state attorney general.  Id.  The plaintiff was subsequently demoted and the school board decided not to renew her contract.  Id. at 1327.  The plaintiff alleged that she was fired in retaliation for exercising her First Amendment rights, and the district court denied the school board member's request for qualified immunity.  The Tenth Circuit found that the plaintiff's complaints about the school board's failure to follow the open meetings act were not part of her official duties, because there was no evidence that her job duties had anything to with enforcing the open meetings act.  Id. at 1332-33.  However, her complaints regarding the Head Start program fell squarely within job duties and overseeing the program was precisely what she was paid to do.  Id. at 1131-32.

In this case, plaintiff was working in a position that required expertise in accounting, particularly with government finance, and she made complaints to an outside agency concerning the misuse of City funds.  Plaintiff's complaints about mismanagement of City funds are squarely related to her finance-related job duties, and the City could reasonably have believed that plaintiff was acting pursuant to her official duties when she made complaints concerning City finances to an external state agency.  The Court finds that plaintiff's speech occurred as part of her official duties and she cannot state a claim for retaliation under the Garcetti/Pickering test.  Plaintiff's claim of retaliation for exercising her rights under the First Amendment (Count XI) is dismissed.

**B.**

The individual defendants, other than Arthur, have filed a motion to dismiss plaintiff's § 1985 claim (Count XVIII) and her state law claims of tortious interference with a business relationship (Count XIII) and tortious interference with prospective economic advantage (Count XIV).  All of the individual defendants, including Arthur, have moved to dismiss plaintiff's

24

intentional infliction of emotional distress claim (Count XVI), but this claim arises as to a different body of facts as to Arthur and the Court will consider issues related to Arthur in a later section of the Opinion and Order.

### Section 1985 (Count XVIII)

Defendants argue that plaintiff has not alleged sufficient facts to support a plausible claim that they conspired to violate her rights under the Equal Protection Clause and, even if she had, the amended complaint contains no allegations suggesting that defendants intended to discriminate against a particular class of persons.  Dkt. # 19, at 13.  Plaintiff responds that she has adequately alleged that defendants collectively agreed to terminate her employment, and this is sufficient to state a claim under § 1985(3).  Dkt. # 22, at 8.

Under § 1985, it is unlawful for "two or more persons in any State or territory [to] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."  42 U.S.C. 1985(3).  In terms of pleading a claim under § 1985(3), the Tenth Circuit has held that a plaintiff must allege "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom."  Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).  Section 1985(3) does not "'apply to all tortious, conspiratorial interferences with the rights of others,' but rather, only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'"  Id. (quoting Griffin v. Breckingridge, 403 U.S. 88, 101-02 (1971)).

Plaintiff's § 1985 claim is simply a recitation of the elements of a § 1985(3) claim, and there are no specific factual allegations explaining the purpose of the conspiracy or any acts of individual

conspirators in furtherance of the conspiracy.  Plaintiff asserts that she has adequately alleged elsewhere in the amended complaint sufficient facts supporting her more general assertion that Shrout, Stewart, Brewer, and Nowlin formed a conspiracy.  The Court has reviewed the allegations cited by plaintiff in her response (Dkt. # 22) and does not find that plaintiff has adequately alleged the existence of a conspiracy.  Plaintiff alleges that Shrout, Stewart, Brewer, and Nowlin "participated" in the decision to terminate plaintiff's employment, but plaintiff's allegations do not suggest that there was any collective decision or conspiracy to terminate her employment.  Even if the Court assumed the existence of a conspiracy, plaintiff has not alleged facts suggesting that the conspiracy was intended to discriminate against a particular class of persons, and plaintiff's § 1985 claim (Count XVIII) is dismissed for failure to state a claim.

**Intentional Infliction of Emotional Distress (Count XVI)**

Shrout, Stewart, Brewer, and Nowlin seek dismissal of plaintiff's claim of intentional infliction of emotional distress, because plaintiff's allegations could not support a finding that these defendants engaged in extreme and outrageous conduct.  Dkt. # 19, at 15-17.  Plaintiff responds that she need only allege facts sufficient for reasonable people to disagree as to whether defendants' conduct was extreme and outrageous.  Dkt. # 22, at 8-9.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

> regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff.  See Computer Publications, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not

27

extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

The Court has reviewed the amended complaint and finds that plaintiff's allegations do not support a plausible claim of intentional infliction of emotional distress. The Court initially notes that plaintiff has provided two different versions of her termination. In the first version, plaintiff alleges that Stewart called plaintiff into a meeting with McCorkle and Arthur, and McCorkle notified plaintiff that her employment was being terminated. Dkt. # 15, at 16. Plaintiff expressed her belief that she was being retaliated against, and Arthur escorted plaintiff off of the premises. Id. In the second version, plaintiff alleges that Shrout, Stewart, Brewer, and Nowlin "fir[ed] Plaintiff in front of other staff" and gave her no time to collect her belongings, and they had her escorted out of the building as if she were a criminal. Id. at 40. She further claims that defendants were aware that she suffered from major depressive order and other psychological conditions, and she claims that she was diagnosed with post-traumatic stress disorder following her termination. Even if the Court accepts the second version as true for the purpose of this Opinion and Order, this does not rise to the level of extreme and outrageous conduct as a matter of Oklahoma law. The mere fact that plaintiff's

employment was terminated in front of other staff and that she was escorted out of the building is not beyond the bounds of all possible decency.  Plaintiff alleges that defendants were aware that she suffered from depression and other psychological conditions, but this fact would not have prevented defendants from terminating her employment or from having her escorted from the building. Plaintiff has failed to allege sufficient facts suggesting that defendants engaged in extreme and outrageous conduct, and her intentional infliction of emotional distress claim should be dismissed as to defendants Shrout, Stewart, Brewer, and Nowlin.

**Tortious Interference Claims (Counts XIII and XIV)**

Defendants Shrout, Stewart, Brewer, and Nowlin argue that they are employees of the City and, as a matter of Oklahoma law, they were not third parties who could be held liable under a tortious interference theory.  Dkt. # 19, at 20-21.  Plaintiff responds that these defendants were acting outside the scope of their employment when they sought to terminate plaintiff's employment, and she can assert tortious interference claims against them.  Dkt. # 22, at 11-13.

Plaintiff has asserted claims for tortious interference with contract (count XIII) and tortious interference with prospective economic advantage (count XIV).  To state a claim for tortious or malicious interference with a business relationship, plaintiff must allege sufficient facts for the Court to infer "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damages proximately sustained as a result of the interference."  Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1165 (Okla. 2009).  A claim for tortious interference with prospective economic advantage is similar and requires a plaintiff to allege "(1) the existence of a valid business or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach

or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted." Cohlmia v. St. John Medical Center, 693 F.3d 1269, 1286-87 (10th Cir. 2012) (applying Oklahoma law).  Oklahoma courts define "interference" as discouraging a third party not to enter into a business relationship or intentionally acting to interfere with a person's business relationship or expectancy, and the intentional interference element of either claim requires a finding of bad faith on the part of the interferor. Loven v. Church Mut. Ins. Co., 452 P.3d 418, 426 (Okla. 2019).   A tortious interference claim cannot be asserted against a person who was a party to the contractual or business relationship that was allegedly interfered with  and such a claim is cognizable only against a third party to the contract or business relationship.  Wilspec Technologies, Inc. v. DunAn Holding Group, Co., 204 P.3d 69, 74 (Okla. 2009).  An employee or agent of a party to the contract cannot generally be held liable under a theory of tortious interference, because an employee or agent is not a third party to the contract.  Voiles v. Santa Fe Minerals, Inc., 911 P.2d 1205, 1210 (Okla. 1996).

Plaintiff alleges that Shrout, Stewart, Brewer, and Nowlin maliciously interfered with her employment, because they decided to terminate her employment for discriminatory purposes.  Dkt. # 15, at 36.  She claims that the City had no lawful interest in terminating her employment, and these defendants were acting contrary to the interests of the City when they made the decision to terminate plaintiff's employment.  Id. at 36-37.  As a matter of Oklahoma tort law, an employee at will generally be found to have acted within the scope of his employment if his actions are consistent with the tasks assigned to him, and a court may also consider whether the employer subsequently ratified the employee's acts. Shephard v. CompSource Oklahoma, 209 P.3d 288, 293 (Okla. 2009). A tortious interference claim cannot be based merely on an employee's interference with the

contract, because this would turn every breach of contract claim into a tort claim against the employee and employer. Martin v. Johnson, 975 P.2d 889, 897 (Okla. 1998). Plaintiff alleges that Shrout, Nowlin, Stewart, and Brewer "participated" in the decision to terminate plaintiff's employment, but her allegations do not support an inference that any of these defendants was acting outside the scope of their employment. At most, these defendants allegedly knew about plaintiff's complaints concerning McCorkle's conduct, but all of the specific actions mentioned by plaintiff fell squarely within the official duties of each defendant. Even if the Court were to assume that individual defendants intended to bring about the termination of plaintiff's employment, she plainly alleges that the City wanted to end plaintiff's employment and the individual defendants were simply acting carrying out the wishes of their employer. See Dkt. # 15, at 15-17. Oklahoma law is clear that an employee or agent generally cannot be held liable for tortious interference with his employer's or principal's contractual relationship, and plaintiff has alleged no facts that would support an inference that the individual defendants were acting outside the scope of their employment. Defendants' motion to dismiss is granted as to the dismissal of counts XIII and XIV of the amended complaint.

## C.

Arthur argues that plaintiff has failed to state a claim under § 1983 based on an alleged violation of plaintiff's Fourth Amendment rights and, in the alternative, he argues that he is entitled to qualified immunity on this claim. Dkt. # 21 at 5. He also asserts that plaintiff has failed to state a claim of intentional infliction of emotional distress against him. Plaintiff responds that Arthur detained her and seized her car keys with no basis to believe that she was intoxicated, and she has adequately stated that Arthur violated her right to be free from an unlawful detention under the

Fourth Amendment.  Dkt. # 24, 8-9.  She also argues that the same factual allegations support a claim for intentional infliction of emotional distress under Oklahoma law.

Plaintiff alleges that Arthur was present at the meeting when she was terminated on June 21, 2018, and he escorted plaintiff off the premises after she demanded an explanation for her termination.  Dkt. # 15, at 16.  Plaintiff makes no allegations that she had any type of interaction or relationship with Arthur before this meeting.  On September 13, 2018, plaintiff drove to the City offices to make a COBRA payment, and Arthur and another police officer approached her while she was still in her car.  Id. at 17.  Arthur accused plaintiff of being under the influence and demanded that she hand over her car keys, and she claims that Arthur mocked her as she gathered her personal belongings from the car.  Id. at 18.  Arthur allegedly asked the other police officer if he should arrest plaintiff, and she claims that Arthur continued to falsely accuse her of being intoxicated or too impaired to drive.  Id.  Plaintiff denies that she was intoxicated or under the influence of any substance, and she claims that she explained to Arthur that she had disabilities that affected her speech.  Id.  Arthur allegedly said "exactly, you should not be driving."  Id.  Plaintiff apparently had difficulty taking her phone out of her purse, and Arthur allegedly stated "you're so impaired you can't even get your phone out of your purse."  Id.  Plaintiff spoke to family members on the phone to arrange for someone to pick her up, and Arthur allegedly grabbed plaintiff's hand and said "she is impaired and not driving" and that someone needed to pick her up.  Id.  The other police officer present issued plaintiff a citation for trespassing, and Arthur told plaintiff that she could not drive in Jenks until she "drops it all."  Id. at 19.  Plaintiff understood this to be a reference to her EEOC charge of discrimination and other complaints against the City.  Id.  Several weeks later, plaintiff received a letter stating that her driver's license had been suspended by the Oklahoma Department

of Public Safety, because the City had reported that plaintiff suffered from an impairment that prevented her from driving safely.  Id.  Plaintiff denies that she has impairment that would prevent her from driving, and she filed a complaint with the City.  Id.  Arthur allegedly refused to investigate plaintiff's complaint and told her to "add it to her EEOC suit."  Id.

**Fourth Amendment (Count XVII)**

Arthur argues that plaintiff has not adequately alleged that she was seized or detained in violation of her Fourth Amendment rights, because she was always free to leave by any means other than driving her own vehicle.  Dkt. # 21, at 8-11.  In the alternative, Arthur asserts that he is entitled to qualified immunity from plaintiff's claim under § 1983, because plaintiff has not met her burden to allege that Arthur violated her constitutional rights or that her rights were clearly established.  Id. at 14-18.  Arthur notes that the amended complaint could also be attempting to state a Fourth Amendment violation under theories of false imprisonment and excessive force, but plaintiff has failed to respond to these arguments and the Court finds that plaintiff has abandoned any claims under a false imprisonment or excessive force theory.

Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States  . . . thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law" of the United States.  "The purpose of § 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity shields public officials from

facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's

claims.  Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth

Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.  A

plaintiff must prove that the defendant's actions violated a specific constitutional right and, if the

plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the

constitutional right was clearly established when the conduct occurred.  Toevs. v. Reid, 685 F.3d

903, 909 (10th Cir. 2012).  A court has the discretion to consider the steps in whatever order is

appropriate under the circumstances.  Id. at 910 (citing Pearson v. Callahan, 555 U.S. 223 (2009)).

Plaintiff bears the burden to prove that his constitutional rights were violated and that the law giving

rise to his claim was clearly established at the time the acts occurred.  Cox v. Glanz, 800 F.3d 1231,

1246 (10th Cir. 2015); Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  Instead of

considering whether plaintiff has stated a claim under § 1983, the Court will determine whether

Arthur is entitled to qualified immunity from plaintiff's § 1983 claim based on an alleged violation

of her Fourth Amendment rights.

Plaintiff claims that her rights under the Fourth Amendment to the United States Constitution

were violated because she was unlawfully detained by Arthur.  The Fourth Amendment guarantees

citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  U.S. CONST.

amend. IV.  "[W]henever a police officer accosts an individual and restrains his freedom to walk

away, he has 'seized' that person."  Terry v. Ohio, 392 U.S. 1, 16 (1968).  "Reasonableness under

the Fourth Amendment 'depends on a balance between the public interest and the individual's right

to personal security free from arbitrary interference by law officers.'" <u>United States v. King</u>, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878 (1975)).  In balancing these interests, the Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. <u>Novitsky v. City of Aurora</u>, 491 F.3d 1244, 1253 (10th Cir. 2007); <u>United States v. Davis</u>, 94 F.3d 1465, 1468 (10th Cir. 1996).  Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity.  <u>Novitsky</u>, 491 F.3d at 1253.  A consensual encounter between police and a citizen does not implicate the Fourth Amendment.  <u>United States v. Hernandez</u>, 847 F.3d 1257, 1263 (10th Cir. 2017).  To determine whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" <u>Id.</u> (quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991)).

Arthur argues that plaintiff was free to leave at any point in the encounter, as long as she did not attempt to drive away in her own vehicle, and plaintiff was not seized under the Fourth Amendment.  Viewing the allegations in a light most favorable to plaintiff, the court finds that a reasonable person in the same situation would not have felt free to leave in light of Arthur's alleged conduct.  Arthur claims that he "trying to assist a citizen from avoiding any legal trouble," but this argument is based on interpretation of plaintiff's allegations that is inconsistent with the standard of review for a motion to dismiss.  Plaintiff alleges that Arthur accused her of driving under the influence and demanded that she hand over her car keys, and he would not allow plaintiff to leave

unless someone came to pick her up.  Dkt. # 15, at 17-18.  A reasonable person may not have felt

that she was "at liberty to ignore the police presence and go about [her] business," and the plaintiff

has alleged sufficient facts to support an inference that an investigative detention occurred.  For the

purpose of this Opinion and Order, the Court will assume that Arthur lacked reasonable suspicion

to believe that plaintiff was under the influence and that her detention was unlawful under the Fourth

Amendment.

      Even if the Court assumes that plaintiff could state a constitutional violation, she must still

show that her constitutional rights were clearly established when the conduct occurred.  The Tenth

Circuit has explained that law is clearly established if the contours of a constitutional right are

"sufficiently clear that a reasonable official would understand that what he is doing violates that

right."  Perry v. Durborow, 892 F.3d 1116, 1123 (10th Cir. 2018).  The contours of a right are

generally "sufficiently clear" only if the plaintiff "identif[ies] an on-point Supreme Court or

published Tenth Circuit decision" or "shows 'the clearly established weight of authority from other

courts [has] found the law to be as plaintiff maintains . . . .'"  Id.  District courts have been cautioned

not to define a constitutional right "at a high level of generality" but, instead, "the clearly established

law must be 'particularized' to the facts of the case."  Id.  To find that the law is clearly established,

the district court must "identify a case where an offic[ial] acting under similar circumstances as

[defendant]" was held to have violated the constitutional right at issue.  Id. at 1124.

      Plaintiff's entire argument as the second prong of the qualified immunity analysis is that

investigative detentions constitute the seizure of a person under the Fourth Amendment and it is

clearly established that an investigative detention must be supported by reasonable suspicion, which

plaintiff alleges was lacking in this case.  Dkt. # 24, at 10.  Plaintiff has made no attempt to identify

a prior Supreme Court or Tenth Circuit decision that is even reasonably similar to the facts of this case, and the Tenth Circuit has been clear that a plaintiff must do more than cite general Fourth Amendment concepts to show that the law is clearly established.  Quinn v. Young, 780 F.3d 998, 1010 (10th Cir. 2015).  General statements of law can suffice in situations in which "they apply 'with obvious clarity to the specific conduct in question.'"  Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018).  However, it is not so obvious that Arthur lacked reasonable suspicion to conduct an investigative detention that plaintiff can simply cite the general legal principle that an investigative detention must be supported by reasonable suspicion.  Plaintiff alleges that she suffered from disabilities and these disabilities "impacted her speech and affect," and Arthur may have perceived plaintiff as impaired because of these disabilities.  Dkt. # 15, at 18.  She also alleges that she had difficulty removing her phone from her purse, and Arthur stated that this suggested that plaintiff was impaired.  Id.  Plaintiff bears the burden to show that the law was clearly established, and specificity is often more important in the Fourth Amendment context when it is sometimes difficult for a police officer to know how the law applies to a specific factual situation.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020).  Plaintiff has cited no authority suggesting that a police officer with knowledge of some facts suggesting that plaintiff was driving under the influence violates the Fourth Amendment by initiating an investigative detention and refusing to allow her to drive away, even if the police officer is ultimately mistaken in his belief that the driver was impaired.  The Court finds that plaintiff has failed to meet her burden to show that the law was clearly established, and Arthur is entitled to qualified immunity from plaintiff's § 1983 claim.

**Intentional Infliction of Emotional Distress (Count XVI)**

Arthur argues that plaintiff's allegations do not support an inference that he engaged in extreme and outrageous conduct, and plaintiff's intentional infliction of emotional distress should be dismissed under Rule 12(b)(6).  Plaintiff claims that Arthur knew that she had disabilities that affected her speech and demeanor, and Arthur mistreated plaintiff and issued a citation for trespassing at her former place of employment.  Dkt. # 24, at 11.  The Court has already set forth the parameters of a claim of intentional infliction of emotional distress.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec, 188 P.3d at 175.  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue, 397 F.3d at 856 n.7 (10th Cir. 2005).

The Court finds that plaintiff has not alleged a plausible claim of intentional infliction of emotional distress against Arthur.  Plaintiff's assertion that Arthur engaged in extreme and outrageous conduct is primarily based on her argument that he knew she suffered from disabilities and falsely accused her of driving under the influence.  However, there are no allegations in the amended complaint suggesting that Arthur had prior knowledge of her alleged disabilities, and she acknowledges that her disabilities affect her speech and demeanor.  Thus, it may not have been unreasonable for Arthur to investigate whether plaintiff was under the influence of a controlled substance or medication.  Plaintiff denies that she was impaired or under the influence, but her own allegations suggest that it could have been reasonable for Arthur to investigate her fitness to drive.

Plaintiff's alleges that Arthur repeatedly mocked and taunted her, and her allegations would support an inference that Arthur engaged in rude or boorish behavior. However, plaintiff's allegations must suggest that Arthur engaged in conduct that was so extreme and outrageous that it goes beyond all possible bounds of decency. Breeden, 575 P.2d at 1376. Most of the statements attributed to Arthur relate to his investigation into plaintiff's driving and, even if insensitive in light of plaintiff's alleged disabilities, the Court does not find that Arthur's conduct would qualify as extreme and outrageous. Count XVI of the amended complaint should be dismissed in its entirety.

**IT IS THEREFORE ORDERED** that the Motion for Partial Dismissal of Plaintiff's Amended Complaint on Behalf of Defendant City of Jenks and Brief in Support (Dkt. # 20) is **granted in part and denied in part**: the motion is granted as to plaintiff's Title VII claims of religious discrimination (count III) and gender discrimination (count I) as to plaintiff's theories of sexual harassment and hostile work environment, but count I remains pending as to gender discrimination on the basis of pay and retaliation. Plaintiff's claims of age discrimination under the ADEA (count IV), FMLA interference (count VII), and her § 1983 claims alleging violations of Fourteenth and First Amendment rights (count X and XI) are also dismissed. The motion is denied as to the dismissal of plaintiff's Equal Pay Act (count II) and her state and federal law claims related to overtime pay (Counts VIII and XV).

**IT IS FURTHER ORDERED** that the Motion for Partial Dismissal of Plaintiff's Amended Complaint on Behalf of Defendants Chris Shrout, Rebecca Stewart, Lisa Brewer, and Teresa Nowlin and Brief in Support (Dkt. # 19) is **granted**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss Plaintiff's Amended Complaint on Behalf of Defendant Cameron Arthur and Brief in Support (Dkt. # 21) is **granted**, and plaintiff's

claims against Arthur are dismissed.  The Court Clerk is directed to terminate Cameron Arthur as a party.

**IT IS FURTHER ORDERED** that the following claims remain for adjudication: gender discrimination as to theories of unequal pay and retaliation (Count I), Equal Pay Act (Count II), ADEA retaliation (Count V), disability discrimination (Count VI), FLSA misclassification (Count VIII), FLSA retaliation (Count IX), Burk tort (Count XII), and failure to pay overtime under Oklahoma law (Count XV).

**DATED** this 9th day of June, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE